UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------- x
In re:                                          :
                                                :    Case No. 15-10243 (MG)
TS EMPLOYMENT, INC.,                            :
                                                :    Chapter 11
                                                :
                              Debtor.           :
----------------------------------------------------------- x
In re:                                          :    Case Nos. 15-12329 (MG), 15-12330
                                                :    (MG), 15-12331 (MG), 15-12332 (MG),
CORPORATE RESOURCE SERVICES, INC.,              :    15-12333 (MG), 15-12334 (MG), 15-
*et al.*,[1]                                    :    12335 (MG), 15-12336 (MG)
                                                :
                                                :    Chapter 11
                              Debtors.          :    (Jointly Administered)
----------------------------------------------------------- x
JAMES S. FELTMAN, not individually but solely   :
as chapter 11 trustee for TS Employment, Inc., and :
for Corporate Resource Services, Inc., *et al.*, :
                                                :
                              Plaintiff,        :    Adv. Proc. No. _____
                                                :
              v.                                :
                                                :
TRI-STATE EMPLOYMENT SERVICE, INC.,             :
TRI-STATE EMPLOYMENT SERVICES, INC.,            :
BROADWAY PEO, INC., CARUSSO                      :
STAFFING CORP., STS GROUP, INC., TRI-           :
STATE SC, INC., ODYSSEY ASSOCIATES,             :
INC., TRI-STATE NORTH CAROLINA, INC.,           :
TSE-PEO, INC., ROBERT CASSERA, JOHN             :
MESSINA, JAMES FOLEY and JOSEPH                  :
CASSERA,                                        :
                                                :
                              Defendants.        :
----------------------------------------------------------- x

---

[1] The Debtors in these chapter 11 cases are: (1) Corporate Resource Services, Inc., (2) Accountabilities, Inc., (3) Insurance Overload Services, Inc., (4) Integrated Consulting Services, Inc., (5) Corporate Resource Development Inc., (6) The CRS Group, Inc., (7) Diamond Staffing Services, Inc., and (8) TS Staffing Services, Inc.

## COMPLAINT

Plaintiff James S. Feltman, not individually but solely as chapter 11 trustee ("Trustee" or "Plaintiff") for the bankruptcy estates of TS Employment, Inc. ("TSE"), Corporate Resource Services, Inc. ("CRS"), and CRS's subsidiaries Accountabilities, Inc., Corporate Resource Development Inc., Diamond Staffing Services, Inc., Insurance Overload Services, Inc., Integrated Consulting Services, Inc., The CRS Group, Inc. and TS Staffing Services, Inc. (the "CRS Subsidiaries," together with CRS, the "CRS Debtors" and, collectively with CRS and TSE, the "Debtors"), hereby states for his Complaint as follows:

## NATURE OF THE ACTION

1.      This is an adversary proceeding by the Debtors' bankruptcy trustee against certain former officers and directors of CRS; the Debtors' affiliate Tri-State Employment Service, Inc. ("Tri-State"); and Tri-State's subsidiaries (collectively with Tri-State, the "Tri-State Group").

2.      From 2010 until January 2015, CRS appeared to be a successful, rapidly-growing temporary staffing business. The publicly-traded company experienced dramatic growth through acquisitions of affiliates and competitors, and its operating subsidiaries were able to offer an expanding customer base—including a number of Fortune 500 companies—extremely competitive pricing and even short-term financing.

3.      As disclosed in its public filings and audited financial statements, CRS's ability to offer highly competitive pricing and rapidly expand its business was dependent upon a contract with TSE, an affiliated professional employer organization ("PEO") that was the employer of record for the hundreds of thousands of temporary workers supplied under CRS's contracts with its customers. That contract permitted CRS to offer its customers highly competitive prices. Its ability to offer highly competitive pricing also was dependent upon savings from low-cost

workers' compensation insurance procured by TSE and Tri-State that could be passed along to CRS customers, and its ability to pay for acquisitions and offer customer financing was dependent on purported financial accommodations from TSE and the Tri-State Group.

4.    But known only to a handful of CRS officers and directors who also held positions at Tri-State, Tri-State and TSE did not have the liquidity needed to make financial accommodations to CRS.  Instead, they financed their accommodations by failing to pay more than $200 million (exclusive of interest and penalties) in employment-related taxes, including almost $100 million in federal taxes related to TSE employees supplied to CRS customers.

5.    Tri-State also procured low premium workers' compensation insurance for itself and TSE by using risky high-deductible policies, mis-categorizing workers in lower-risk occupations, and manipulating loss estimates.  Although in the short term this meant reduced workers' compensation premiums, the high deductible program soon resulted in large unreserved liabilities that could not be passed along to CRS customers, and ultimately the insurer's liquidation when it could no longer secure reimbursement from TSE.  No reserve ever was booked for any TSE workers' compensation losses.

6.    Even worse, TSE turned out to be an alter ego of Tri-State in every sense.  TSE had no office space, employees or financial systems separate from Tri-State; virtually all of its business functions were performed and controlled by Tri-State Group employees.  TSE did not maintain even basic corporate records, and Tri-State employees represented that they held TSE officer positions that did not exist.

7.    TSE was completely dominated and controlled by Tri-State.  Each day, substantially all of TSE's cash was swept to Tri-State Group accounts, where it was commingled and used by Tri-State Group and its insiders for whatever purpose suited them.  And although

some of the funds were used to meet TSE payroll and related expenses in order to keep the supply of cash to Tri-State flowing, large amounts were improperly used for purposes unrelated to TSE and CRS.

8.     The Trustee brings this complaint against the Tri-State Group and its insiders to recover hundreds of millions of dollars improperly transferred from TSE to the Tri-State Group, and to impose alter ego liability upon Tri-State for its complete and self-serving domination of TSE to the detriment of TSE's creditors.  The Trustee also seeks to impose personal liability upon the CRS officers and directors who knew about the failures to remit taxes, the workers' compensation claims exposure, and TSE and the Tri-State Group's real financial condition, but withheld that information and failed to take actions that would have enabled CRS to extricate itself from its relationship with TSE and Tri-State.  The Trustee also seeks an injunction to preserve the transferred TSE assets, or their proceeds, for recovery and return to the estates, by preventing the further dissipation of those assets to the detriment of the Debtors' estates and their creditors.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction pursuant to 28 U.S.C. § 1334(b) because this adversary proceeding arises under Title 11, and arises in and is related to the chapter 11 cases *In re TS Employment, Inc.*, Case No. 15-10243, and *In re Corporate Resource Services, Inc. et al*, Case Nos. 15-12329 through 12236, all pending in the United States Bankruptcy Court for the Southern District of New York.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1409(a).

11.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B), (C),  (F), (H), and (O).

12.     The Trustee consents to entry of final order or judgment by this Court.

## THE PARTIES

13.     Plaintiff James S. Feltman is the chapter 11 trustee for TSE and the CRS Debtors, duly appointed under section 1104(a) of the Bankruptcy Code by the United States Trustee for this region on February 27, 2015 and September 22, 2015, respectively.

14.     Debtor TSE is a privately-held Florida corporation, with its principal place of business in New York.  Defendant Robert Cassera directly or indirectly owns 100% of its issued and outstanding stock.

15.     Debtor CRS is a formerly publicly-traded Delaware corporation, with its principal place of business in New York.  Defendant Robert Cassera directly or indirectly owns the majority of CRS's issued and outstanding stock.

16.     Debtor Accountabilities, Inc. is a Delaware corporation with its principal place of business in New York.  CRS owns all of its stock.

17.     Debtor Insurance Overload Services, Inc. is a Delaware corporation with its principal place of business in New York.  CRS owns all of its stock.

18.     Debtor Integrated Consulting Services, Inc. is a Delaware corporation with its principal place of business in New York.  CRS owns all of its stock.

19.     Debtor Corporate Resource Development Inc. is a Delaware corporation with its principal place of business in New York.  CRS owns all of its stock.

20.     Debtor The CRS Group, Inc. is a Delaware corporation with its principal place of business in New York.  CRS owns all of its stock.

21.     Debtor Diamond Staffing Services, Inc. is a Delaware corporation with its principal place of business in New York.  CRS owns all of its stock.

22.     Debtor TS Staffing Services, Inc. is a Texas corporation with its principal place of business in New York.  CRS owns all of its stock.

23.    Defendant Tri-State is a New York corporation with its principal place of business in New York.  Defendant Robert Cassera directly or indirectly owns 100% of its issued and outstanding stock.

24.    Defendant Tri-State Employment Services, Inc., ("Tri-State S") is a Nevada corporation with its principal place of business in New York.  Tri-State owns all of its stock.

25.    Defendant Broadway PEO, Inc. is a New York corporation with its principal place of business in New York.  Tri-State owns all of its stock.

26.    Defendant Carusso Staffing Corp. is a New York corporation with its principal place of business in New York. Tri-State owns all of its stock.

27.    Defendant STS Group, Inc. is a Florida corporation with its principal place of business in New York.  Tri-State owns all of its stock.

28.    Defendant Tri-State SC, Inc. is a South Carolina corporation.  Tri-State owns all of its stock.

29.    Defendant Odyssey Associates, Inc., formerly known as Tri-Odyssey PEO, Inc., is a Nevada corporation with its principal place of business in New York.   Tri-State owns all of its stock.

30.    Defendant Tri-State North Carolina, Inc. is a North Carolina corporation with its principal place of business in New York.  Tri-State owns all of its stock.

31.    Defendant TSE-PEO, Inc. is a New York corporation with its principal place of business in New York.  Tri-State owns all of its stock.

32.    Defendant Robert Cassera is a resident of New York and of Florida.  At all times relevant to this Complaint, Robert Cassera was directly or indirectly the owner of 100% of the issued and outstanding stock of TSE and Tri-State, directly or indirectly the majority shareholder

of CRS, a director of CRS, the president and a director of Tri-State, and held himself out to be the president of TSE.

33. Defendant John Messina is a resident of New Jersey. At all times relevant to this Complaint, Messina was the president and chief executive officer of CRS, chairman of the board of directors of CRS, and executive vice-president of Tri-State.

34. Defendant Joseph Cassera is a resident of Florida. At all times relevant to this Complaint, Joseph Cassera was a director of CRS, and vice-president of operations of Tri-State. He is Robert Cassera's brother.

35. Defendant James Foley is a resident of New Jersey. At all times relevant to this Complaint, Foley was a director of CRS, the chief operating officer of Tri-State, and held himself out to be the chief operating officer of TSE.

## FACTS

### The Staffing Business

36. Robert Cassera founded Tri-State in 1993 as a temporary staffing company. The company grew in size over the next 15 years, including through acquisitions that became part of the Tri-State Group. Certain corporations within the Tri-State Group served as PEO for staffing businesses within the Tri-State Group, and for staffing businesses owned by Robert Cassera.

37. By 2010, the Tri-State Group had become a national provider of staffing, recruiting and consulting services, with a focus on light industrial services, clerical and administrative support and insurance related staffing.

38. In 2010, Accountabilities, Inc., which at the time was directly or indirectly majority-owned by Robert Cassera, completed a holding-company reorganization in which it became a wholly owned subsidiary of CRS (incorporated the previous year), CRS became a

publicly-traded company, and Robert Cassera became the direct or indirect majority owner of CRS.

39.     Thereafter, CRS began pursuing a strategy of rapid expansion by acquiring affiliates from Tri-State, Robert Cassera and competitors.  Among other acquisitions, CRS purchased Tri-Overload Staffing (renaming it Insurance Overload Services) from a Tri-State Group entity in 2010; Tri-Diamond Staffing and TS Staffing from a Tri-State Group entity and Robert Cassera, respectively, in 2011; and the Summit Software division of Tri-Tel Communications, Inc., a company owned by Robert Cassera, in 2013.  Third-party acquisitions by CRS included Integrated Consulting Group of NYC LLC in 2010; Cameo Personnel Systems in 2011; and Personally Yours Staffing, Inc., Personnel Solutions, and Flex Recruitment Plus Ltd. (U.K.), all in 2013.

40.     By January 2014, the CRS Debtors had more than 800 employees and operated over 200 locations.  CRS reported that its gross revenue had grown from $120.9 million in fiscal year ending September 30, 2010 to $819.7 million in 2013.  In 2013, it placed approximately 150,000 temporary workers with approximately 5,000 customers.

41.     CRS's apparent success in large part derived from its ability to provide customers with temporary and seasonal workers at highly-competitive costs, and its access to working capital to fund acquisitions and growth.  CRS also provided a number of its customers with short-term financing to help them to more evenly distribute the expense of seasonal staffing, an attractive differentiator from many other staffing companies.

42.     CRS's highly-competitive prices were made possible by its PEO relationship with TSE, which charged CRS for its PEO services as described below.

43.     TSE was incorporated by Robert Cassera in 2010 to act as the PEO for CRS, as well as for the Tri-State and Robert Cassera-owned staffing businesses that were in the process of being acquired by CRS.  The CRS Debtors were TSE's only customer.  Other Tri-State Group entities continued to act as PEO for Tri-State Group or Robert Cassera-owned staffing businesses that were not acquired by CRS.

44.     Pursuant to an agreement dated August 27, 2010 (the "TSE PEO Agreement"), TSE agreed to provide PEO services to CRS.  As PEO, TSE was the employer of record for the hundreds of thousands of temporary or seasonal workers sourced by CRS for customers, and was responsible for the payment of temporary worker's wages and payroll, remittance of withholdings, payment of employer taxes, and risk management underwriting and payment of workers' compensation insurance.

45.     In exchange for PEO services, TSE was entitled under the TSE PEO Agreement to be reimbursed by CRS for all compensation paid to temporary workers, the employer's share of taxes, workers' compensation expenses and similar costs, plus an "administrative fee" purportedly representing the cost of TSE's PEO services and profit. TSE billed CRS for the payroll, tax and related obligations it incurred on behalf of the CRS customers, plus its administrative fee.  CRS then passed those charges on to its customers, plus an additional fee for its own services.

46.     CRS's public filings disclosed the importance of its relationship with TSE to its continued viability and growth.  For example, CRS's Form 10-K for the fiscal year ending January 3, 2014 disclosed that, if TSE and Tri-State Group entities "were to cease providing us with professional employer services (which include payroll and related administrative services), we may not be able to secure a comparable provider of such services at agreeable rates.  Should

we be unsuccessful at finding a comparable provider, we may not be able to secure required workers' compensation insurance on affordable terms. The failure to obtain a comparable provider of workers' compensation insurance at affordable rates would possibly require significant capital requirements that are not currently available to us."

47. CRS's public filings also disclosed its reliance on financial accommodations from TSE and the Tri-State Group. For example, the same 2014 Form 10-K warns that CRS was historically "heavily reliant upon financing from related parties," and its balance sheet listed over $15 million in loans payable to related parties.

**TSE Was an Alter Ego of Tri-State**

48. From its inception, even though it was not Tri-State subsidiary, TSE had no real existence as a business separate from Tri-State, failed to observe basic corporate formalities, and was utterly dominated and controlled by Tri-State.

49. TSE never had any board meetings at which officers were appointed, and on information and belief no shareholder or director resolutions ever were executed in lieu of meetings. TSE did not even maintain a corporate minute book or corporate record book.

50. Robert Cassera has declared under oath that he was TSE's only officer, its president. On information and belief, no corporate documents evidencing his selection as president exist.

51. Foley represented in TSE's 2013 management representation letter to TSE's auditor (which at the same time was the auditor for several Tri-State Group entities) that he was the chief operating officer of TSE. No corporate documents evidencing his selection as a TSE officer exist, and on information and belief Foley did not actually hold that position.

52. Annual reports filed with the Florida Secretary of State indicate that Robert Cassera sister, Yolanda Trippiedi, was TSE's secretary. Yolanda Trippiedi represented in TSE's

2014 management representation letter to TSE's auditor that she was the vice president of TSE. No corporate documents evidencing her selection as a TSE officer exist, and on information and belief she did not actually hold either position.

53. A Tri-State employee, Nina Kuris, represented in TSE's 2012 management representation letter to TSE's auditor that she was the controller of TSE. No corporate documents evidencing her selection as a TSE officer exist, and on information and belief she did not actually hold that position.

54. Regardless of whether TSE had any real officers, officers of Tri-State, including the Defendants Robert Cassera, Messina, Joseph Cassera and Foley, acted as *de facto* management for TSE, exerting total control over TSE's operations.

55. TSE had no offices independent of Tri-State, and instead "resided" in the same space occupied by Tri-State at its 160 Broadway, New York, NY offices.

56. TSE had no employees, excluding the temporary workers provided to CRS customers. For example, no TSE employee carried out basic PEO functions such as preparing W-2s or payroll tax returns for the staffing company's temporary employees. Instead, those tasks were performed by employees of Tri-State Group entities.

57. TSE also shared the same auditor as several Tri-State Group entities, and Tri-State and TSE used the same small accounting firm to provide accounting services and prepare tax returns from each of them.

58. Tri-State's complete domination over TSE extended to its cash.

59. To enable them to provide short-term financing to its customers, as well as for its own business purposes, the CRS Subsidiaries established a receivables financing relationship with Tri-State's long-standing lender, Wells Fargo Bank N.A. ("Wells Fargo"), which was

guaranteed by CRS. In connection with that financing relationship, the CRS Subsidiaries pledged customer receivables as security to Wells Fargo. As the CRS Subsidiaries' customer receivables were collected by Wells Fargo and new CRS Subsidiaries' customer receivables were created and pledged to Wells Fargo, Wells Fargo advanced funds to the CRS Subsidiaries, typically on a daily basis. The CRS Subsidiaries in turn remitted to TSE almost all of the proceeds of the Wells Fargo advances so that TSE could pay temporary worker wages, employer taxes and workers' compensation insurance premiums for employees supplied to CRS Subsidiary customers by TSE.

60. Each day, after the CRS Debtors made their payments to TSE, substantially all of TSE's funds were swept from TSE accounts to Tri-State Group accounts, where they were commingled with Tri-State Group funds. The Tri-State Group then used the funds for a variety of purposes, many unrelated to TSE or the CRS Debtors.

61. Tri-State ensured that TSE's basic payroll obligations to temporary and seasonal workers were met, and caused TSE's payroll accounts to be funded, thus keeping the Debtors' businesses (and the flow of funds from the CRS Debtors to TSE to Tri-State Group) alive. But as described below, beginning in 2013 at the latest, Tri-State Group entities began failing to remit large amounts to taxing authorities on account of TSE's payroll tax-related obligations, causing them to go unpaid.

62. During the one year preceding TSE's bankruptcy alone, Tri-State caused more than $950 million to be transferred from TSE to Tri-State Group entities by wire or bank transfer (the "One-Year Transfers"). A schedule listing the One-Year Transfers identified to date by the Trustee is attached as Exhibit A.

63.     The proceeds of tens of millions of dollars of One-Year Transfers were not used for the benefit of TSE, and instead were commingled and used for the benefit of the Tri-State Group and its insiders, or for other purposes unrelated to TSE.  Those uses ultimately included satisfying Tri-State Group tax liabilities that had gone unpaid, as well as for construction, restaurant and other businesses owned by Robert Cassera.

64.     During the two years preceding TSE's bankruptcy, Tri-State caused more than $1.7 billion to be transferred from TSE to Tri-State Group entities by wire or bank transfer (the "Two-Year Transfers").   A schedule listing the Two-Year Transfers identified to date by the Trustee, which incorporates by reference the schedule of One-Year Transfers, is attached as Exhibit B.

65.     As with the One-Year Transfers, the proceeds of hundreds of millions of dollars of Two-Year Transfers were not used for the benefit of TSE, and instead were commingled and used for the benefit of the Tri-State Group and its insiders, or for other purposes unrelated to TSE.

66.     During the six years preceding TSE's bankruptcy, Tri-State caused more than $3.0 billion to be transferred from TSE to Tri-State Group entities by wire or bank transfer (the "Tri-State Transfers").  A schedule listing the Tri-State Transfers identified to date by the Trustee, which incorporates by reference the schedules of One-Year Transfers and Two-Year Transfers, is attached as Exhibit C.

67.     As with the One-Year Transfers and Two-Year Transfers, the proceeds of hundreds of millions of dollars of Tri-State Transfers were not used for the benefit of TSE, and instead were commingled and used for the benefit of the Tri-State Group and its insiders, or for other purposes unrelated to TSE.

68. TSE was chronically undercapitalized for the business in which it was engaged, and has been insolvent at all times since 2011.

69. TSE's initial capitalization was only $100,000. Tri-State and Robert Cassera designed, structured and operated TSE in such a manner that TSE never could become profitable or even break even, and would always be undercapitalized and insolvent.

70. As indicated above, TSE had no employees or business independent from Tri-State, and substantially all of its business functions were performed by officers or employees of Tri-State. Tri-State and Cassera purportedly caused TSE to enter into an agreement with Tri-State pursuant to which Tri-State would charge an administrative fee to TSE in exchange for those services.

71. Tri-State ostensibly charged TSE an administrative fee in 2012 equal to 1.75% of TSE's gross wages (a fee of roughly $9.5 million), and an administrative fee in 2013 equal to 1.45% of TSE's gross wages (a fee of roughly $9.4 million), and caused TSE's books to reflect that fee. However, Tri-State and Robert Cassera caused TSE to bill CRS for administrative services at a rate that was significantly less than the amount Tri-State was purporting to charge TSE—in other words, TSE was providing PEO services to CRS at a perpetual loss relative to the administrative services fee Tri-State was purporting to charge TSE, and that loss built over time.

72. For example, in 2013 Tri-State caused $9.38 million in administrative fees owed to Tri-State to be reflected on TSE's books; during that same time period, Tri-State caused TSE to only charge CRS roughly $3.25 million in administrative fees.

73. Moreover, notwithstanding TSE's continuing losses, instead of increasing the fee charged by TSE, Tri-State and Robert Cassera caused the administrative fee charged to CRS to

drop dramatically over time, down from 2.0% of gross wages in 2011 to 1.4% of gross wages in 2013, to 0.7% of gross wages beginning in February 2014.

74. As a source of liquidity and working capital to finance its third-party acquisitions and growth and cover the substantial overhead costs associated with its public holding company structure, CRS deferred payment of TSE's administrative fee, and relied upon additional financial accommodations from TSE.

75. By 2012, CRS owed TSE approximately $14.1 million; as disclosed in CRS's public filings, in 2012 CRS and TSE entered into two agreements under which TSE accepted CRS common stock in satisfaction of the $14.1 million owed to it by CRS. Of course, TSE did not have $14.1 million (or indeed any meaningful capital or source of liquidity) to absorb the non-cash satisfaction of the CRS receivable in 2012.

76. Throughout 2013, CRS's intercompany payable to TSE again accrued, and this time grew to approximately $13 million by year-end. CRS did not pay this intercompany debt, but instead deferred payment so that it would have additional working capital to finance further acquisitions and cover its substantial overhead costs. Just as TSE did not have capital or a source of liquidity to absorb the non-cash satisfaction of the CRS receivables in 2012, it did not have the capital or a source of liquidity to absorb deferral of payment of this receivable in 2013.

77. By the end of 2014, the intercompany payable from CRS to TSE had grown to roughly $45 million. TSE did not have the capital or a source of liquidity to absorb deferral of payment of this receivable, the natural result of which was that TSE obligations to creditors would go unpaid.

78.     In sum, TSE was designed, structured and operated by Tri-State and Robert Cassera in such a manner that it would always be undercapitalized and insolvent, and never had the means to satisfy the obligations it was incurring.

79.     Each of Robert Cassera, Messina, Joseph Cassera and Foley knew that TSE's funds were being swept from to Tri-State Group accounts where they were being used for purposes unrelated to TSE or CRS, and that TSE was chronically undercapitalized and insolvent, but did not inform CRS's other board members, independent management, public shareholders or other employees of those facts, or take any actions to protect CRS's businesses from the mounting risks associated with those facts.

**TSE and the Tri-State Group's Massive Unpaid Tax Liability**

80.     Unbeknownst to CRS's independent directors, public shareholders and all but a handful of CRS's officers and employees, there was no source of liquidity or working capital to fund TSE's accommodations to CRS.   Instead, TSE and Tri-State failed to pay federal employment-related taxes on a massive scale.

81.     A pattern of significant federal tax late payments and non-payments began at the latest in 2009.  In February 2011, the IRS filed a tax lien against TS Staffing, a Robert Cassera-owned company acquired by CRS later that year, for $830,000 in unpaid 2009 taxes.  In 2012, the IRS notified Defendant TSE-PEO that it was late on $18.9 million in taxes for the previous year; in March 2014, the IRS notified TSE that it was behind on $600,000 in taxes for 2012; and in June 2014, the IRS notified Tri-State that it had not paid $7.6 million in taxes for 2012 and $23.5 million in 2013.

82.     At the end of 2013, TSE's books reflected a massive $67 million unpaid federal payroll tax liability for that year.   Tri-State and its outside accountant caused a year-end intercompany general ledger entry to be recorded eliminating the liability on TSE's books, and

caused it to be reflected on Tri-State's books. Of course, even if Tri-State had legitimately intended to eventually satisfy and pay TSE's obligation, this accounting treatment would have been inappropriate inasmuch as TSE remained liable for its federal tax obligation until it was paid. TSE's auditor provided an unqualified audit opinion for 2013 that did not reflect this federal payroll tax liability.

83. In late 2014, the 2013 year-end general ledger entry referenced above was reversed by Tri-State and its outside accountant. Tri-State also caused significant portions of TSE's 2014 federal payroll tax liability to go unpaid. By the time TSE's bankruptcy case was commenced on February 2, 2015, TSE's books reflected an unpaid federal payroll tax liability that had ballooned to almost $100 million, not including penalties or interest.

84. Not surprisingly, Tri-State Group entities also had been failing to pay their own payroll taxes. The Tri-State Group, for its part, had amassed an additional roughly $105 million in unpaid federal payroll tax liabilities by February 2, 2015, not including penalties or interest.

85. Each of Robert Cassera, Messina, Joseph Cassera and Foley knew that TSE and Tri-State Group had not paid tens—and eventually hundreds—of millions of dollars of federal payroll taxes, but did not inform CRS's other board members, independent management, public shareholders or other employees of those facts, or take any actions to protect CRS's businesses from the mounting risks associated with those facts.

**Workers' Compensation Costs**

86. Tri-State and Robert Cassera also kept workers' compensation costs artificially low by failing to properly estimate and reserve for workers' compensation claims exposure, and by failing to bill CRS and its customers for TSE's actual workers' compensation expenses.

87. Workers' compensation insurance poses particular risks for PEOs and their insurance carriers. PEOs typically do not retroactively charge customers for workers'

compensation claims as the losses are incurred over the years. Instead, the PEO charges each customer up front for the estimated cost of the PEO's anticipated workers' compensation expenses, and bears the risk that it has underestimated its long-term workers compensation exposure. As the National Association of Insurance Commissioners ("NAIC") has explained, a PEO thus faces the difficult task of "analyz[ing] its development patterns, estimat[ing] its expected losses, select[ing] an appropriate safety margin and discount rate, and then allocat[ing] anticipated costs among its clients in a manner that allows it to remain competitive in the marketplace." NAIC, *Workers' Compensation Large Deductible Study* 46 (2006) ("*Large Deductible Study*").

88. Failure to properly estimate and charge customers for workers' compensation costs can result in significant losses to the PEO and potentially insolvency. If the PEO becomes insolvent, the workers' compensation insurance carrier is left to foot the bill for unfunded fees and costs.

89. These risks are magnified if the PEO takes out a high deductible policy. The NAIC further warns that "[a]n especially hazardous situation would occur if a PEO were allowed to use a small affiliated insurer to write a large deductible policy. . . . The danger is that should the PEO become insolvent, either from its assumption of workers' compensation risk or for some other reason . . . , then its affiliated insurer would be likely to fail along with the PEO." *Large Deductible Study*, at 48.

90. Turning a blind eye to these risks, TSE's insurer was forced into liquidation after TSE, which along with Tri-State represented a large portion of its business, commenced its bankruptcy case. The insurer, Lumbermen's Underwriting Alliance ("Lumbermen's"), had agreed to underwrite and administer a workers' compensation insurance program under which

Tri-State and TSE (as an additional named insured) reimbursed Lumbermen's for a "deductible" of $1.25 million per occurrence for bodily injury and $1.25 million per employee for disease. This effectively meant that TSE, the employer of record for more than 100,000 temporary workers, was self-insured for all but the largest workers' compensation claims.

91.     Tri-State incorrectly classified many higher-risk temporary and seasonal workers as working in lower-risk positions, and on that basis was able to secure even lower workers' compensation insurance premiums from Lumbermen's.

92.     The combination of a high-deductible policy under which TSE essentially was self-insured, and the misclassification of many temporary workers as lower-risk employees meant, in the short term, that TSE initially paid lower insurance premiums to Lumbermen's and purported to pass those savings along to CRS and is customers.  However, TSE bore an ever-increasing risk of loss.  As more and more workers' compensation claims were submitted and its claims experience developed, TSE became liable to Lumbermen's for tens of millions of dollars in deductibles associated with those claims, and could not pass those losses along to CRS's customers.

93.     Further compounding TSE's financial problems, Tri-State improperly allocated workers' compensation expenses that should have been Tri-State Group liabilities to TSE.  As indicated above, as CRS acquired staffing companies from Tri-State Group entities or Robert Cassera, the PEO services were transitioned from a Tri-State Group PEO to TSE.  However, as pre-existing workers' compensation losses associated with the businesses acquired by CRS continued to develop, Tri-State did not properly allocate losses to the Tri-State Group PEO, and instead reflected on Tri-State and TSE's books that TSE was responsible for the workers' compensation expenses associated with those businesses.  In other words, if a temporary worker

was injured while employed by a Tri-State Group PEO, when the related staffing company was sold to CRS and TSE replaced the Tri-State Group entity as PEO, Tri-State and TSE's books improperly reflected that TSE, not the Tri-State Group PEO, was now liable for that loss.

94.     Even as workers' compensation expenses mounted, Tri-State caused TSE to under-bill CRS for workers' compensation costs.  According to TSE invoicing records, in 2013 and 2014, respectively, TSE billed CRS—its only customer—$18 million and $22 million for workers' compensation expenses.  However, TSE's income statements for those years reported its workers' compensation costs as $25 million and $87 million, respectively.  In other words, TSE's 2014 actual workers' compensation expenses exceeded the workers' compensation expenses which it billed CRS (and CRS in turn billed its customers) by more than 300%.

95.     Remarkably, notwithstanding years of workers' compensation losses in the tens of millions of dollars, TSE never booked a single penny of reserves for any potential or accrued workers' compensation claims.

96.     Each of Robert Cassera, Messina, Joseph Cassera and Foley knew that TSE and Tri-State Group had insufficient capital and liquidity to cover workers' compensation expenses, that TSE had no reserves for workers' compensation expenses, and that TSE was suffering tens of millions of dollars of losses as a result of Tri-State's high deductible workers' compensation insurance program, all of which put TSE's continued viability at risk, but did not inform CRS's other board members, independent management, public shareholders or other employees of those facts, or take any actions to protect CRS's businesses from the mounting risks associated with doing business with TSE and Tri-State.

97.     On February 2, 2017, TSE filed bankruptcy after its failure to pay federal payroll taxes became known.  As a result, CRS's options for preserving the values of the CRS

Subsidiaries' businesses were severely damaged, resulting in substantial losses for CRS's and TSE's creditors.

**COUNT I**

**Breach of Fiduciary Duty to CRS**
**(Robert Cassera, Messina, Joseph Cassera and Foley)**

98.     Plaintiff restates and re-alleges paragraphs 1 through 97 of this Complaint as though fully set forth herein.

99.     At all times relevant to this Complaint, Robert Cassera, Messina, Joseph Cassera and Foley were directors and officers of CRS.

100.    As directors and officers of CRS, Robert Cassera, Messina, Joseph Cassera and Foley each owed a duty of loyalty to CRS, and were obligated to act in good faith and in the best interest of CRS.

101.    As directors and officers of CRS, Robert Cassera, Messina, Joseph Cassera and Foley each owed an obligation to deal honestly and fairly with CRS.

102.    Robert Cassera, Messina, Joseph Cassera and Foley each breached their fiduciary duties to CRS by engaging in the conduct described with particularity in this Complaint; by failing to inform CRS's Board of Directors of TSE's mounting tax liability; by failing to inform CRS's Board of Directors of TSE's actual workers' compensation costs and risks; and by taking actions or failing to stop actions that benefited themselves or the Tri-State Group to the prejudice and detriment of CRS.

103.    Because Robert Cassera, Messina, Foley, and Joseph Cassera breached their fiduciary duties, CRS's Board of Directors and other employees were not aware of the dire need to extricate CRS from its relationship with TSE and Tri-State until it was too late.  As result,

when TSE filed bankruptcy, the values of the CRS Subsidiaries' businesses were severely damaged.

104.    As a proximate result of Robert Cassera, Messina, Foley, and Joseph Cassera's breaches of their fiduciary duties, CRS has been damaged in an amount exceeding $100 million.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff, as chapter 11 trustee of CRS, and against Robert Cassera, Messina, Foley, and Joseph Cassera, jointly and severally, in an amount to be determined at trial, plus interest, costs and attorneys' fees, and such other equitable relief as may be just and proper.

## COUNT II

### Breach of Fiduciary Duty to TSE
### (Robert Cassera, Messina, Joseph Cassera and Foley)

105.    Plaintiff restates and re-alleges paragraphs 1 through 97 of this Complaint as though fully set forth herein.

106.    At all times relevant to this Complaint, Robert Cassera, Messina, Joseph Cassera and Foley each served as *de facto* officers of TSE.

107.    At all times relevant to this Complaint, Robert Cassera and Foley held themselves out to be officers of TSE.

108.    Robert Cassera, Messina, Joseph Cassera and Foley each had an obligation to deal honestly and fairly with TSE.

109.    Robert Cassera, Messina, Joseph Cassera and Foley each owed a duty of loyalty to TSE, and were obligated to act in good faith and in the best interest of TSE.

110.    Robert Cassera, Messina, Joseph Cassera and Foley breached their fiduciary duties to TSE by engaging in the conduct described with particularity in this Complaint,

authorizing and directing the Tri-State Transfers, and by taking other actions that benefited themselves and Tri-State Group to the prejudice and detriment of TSE and its creditors.

111.    As a proximate result of Defendants' breaches of their fiduciary duties, TSE has been damaged in an amount exceeding $100 million.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff, as chapter 11 trustee of TSE, and against the Individual Defendants, jointly and severally, in an amount to be determined at trial, plus punitive damages in an amount to be determined by the Court, interest, costs and attorneys' fees, and such other equitable relief as may be just and proper.

## COUNT III

### Declaratory Judgment: Alter Ego
### (Tri-State)

112.    Plaintiff restates and re-alleges paragraphs 1 through 97 of this Complaint as though fully set forth herein.

113.    Tri-State organized and used TSE to mislead creditors, including as described in this complaint.

114.    Tri-State dominated and controlled TSE to such an extent that TSE's existence was in fact nonexistent, and TSE was in fact an alter ego of Tri-State.

115.    Tri-State used TSE's corporate form for improper purposes, including but not limited as a way to funnel cash to itself, its subsidiaries and other Robert Cassera-owned businesses.

116.    Tri-State's domination and control over TSE caused injury to TSE and its creditors in an amount exceeding $100 million.  Because of Tri-State's domination and control

over TSE and Tri-State's abuse of TSE's corporate form, Tri-State is liable to TSE's creditors for any and all of TSE's debts and other liabilities.

WHEREFORE, Plaintiff, as chapter 11 trustee of TSE, respectfully requests that the court enter judgment declaring that Tri-State is the alter ego of and legally responsible for all the debts and liabilities of TSE, and for such other declaratory relief as is equitable and just.

## COUNT IV

**Avoidance and Recovery of Transfers Pursuant to
§§ 548(a)(1)(B) and 550(a) of the Bankruptcy Code
(Tri-State Group and Robert Cassera)**

117.    Plaintiff restates and re-alleges paragraphs 1 through 97 of this Complaint as though fully set forth herein.

118.    The Two-Year Transfers constituted transfers of interests in TSE's property.

119.    The Two-Year Transfers were made, mediately or immediately, to the Defendants who received the Two-Year Transfers as described in this Complaint.

120.    Robert Cassera benefitted from each of the Two-Year Transfers because he was able to use the commingled proceeds of the Two-Year Transfers for his own purposes, including to fund other businesses owned or controlled by him.

121.    Each entity within the Tri-State Group benefitted from each of the Two-Year Transfers because it was able to use the commingled proceeds of the Two-Year Transfers to fund its own business operations.

122.    TSE received less than reasonably equivalent value in exchange for the Two-Year Transfers.

123.    TSE was insolvent on the dates that each Two-Year Transfer was made or became insolvent as a result of each of the Two-Year Transfers.

124.    At the time each of the Two-Year Transfers was made, TSE was engaged in business or a transaction, or was about to engage in business or a transaction, for which TSE's remaining property was an unreasonably small capital.

125.    At the time each of the Two-Year Transfers was made, TSE intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

126.    The Trustee may avoid all Two-Year Transfers pursuant to section 548(a)(1)(B) of the Bankruptcy Code.

127.    The Trustee may recover, for the benefit of the TSE estate, the Two-Year Tri-State Transfers or their value from the Defendant that received the Two-Year Transfers as described in this Complaint, and from each member of the Tri-State Group and Robert Cassera as the persons or entities for whose benefit each of the Two-Year Transfers was made.

128.    Pursuant to sections 550(a) and (f) of the Bankruptcy Code, within one year after the Court enters judgment avoiding any Two-Year Transfer to a Defendant that was the initial transferee as described in this Complaint, the Trustee may bring an action to avoid any subsequent transfer of a Two-Year Transfer to any immediate or mediate transferee, including but limited to any of the Defendants named herein.  The Trustee expressly reserves the right to bring such additional actions.

WHEREFORE, Plaintiff, as chapter 11 trustee of TSE, respectfully requests that the Court enter an Order (a) avoiding each of the Two-Year Transfers pursuant to section 548(a)(1)(B) of the Bankruptcy Code; (b)  entering judgment against each Tri-State Group entity and Robert Cassera pursuant to section 550(a) of the Bankruptcy Code in the amount of the Two-Year Transfers; (c) awarding Plaintiff pre- and post-judgment interest, costs, and attorneys' fees and expenses; and (d) granting such other equitable relief as may be just and proper.

## COUNT V

### Avoidance and Recovery of Transfers Pursuant to §§ 548(a)(1)(A) and 550(a) of the Bankruptcy Code (Tri-State Group and Robert Cassera)

129.    Plaintiff restates and re-alleges paragraphs 1 through 97 of this Complaint as though fully set forth herein.

130.    The Two-Year Transfers constituted transfers of interests in TSE's property.

131.    The Two-Year Transfers were made, mediately or immediately, to the Defendants who received the Two-Year Transfers as described in this Complaint.

132.    Robert Cassera benefitted from each of the Two-Year Transfers because he was able to use the commingled proceeds of the Two-Year Transfers for his own purposes, including to fund other businesses owned or controlled by him.

133.    Each entity within the Tri-State Group benefitted from each of the Two-Year Transfers because it was able to use the commingled proceeds of the Two-Year Transfers to fund its own business operations.

134.    The Two-Year Transfers were made with the actual intent to hinder or delay TSE's creditors.

135.    The Trustee may avoid all Two-Year Transfers pursuant to section 548(a)(1)(A) of the Bankruptcy Code.

136.    The Trustee may recover, for the benefit of the TSE estate, the Two-Year Tri-State Transfers or their value from the Defendant that received the Two-Year Transfers as described in this Complaint, and from each member of the Tri-State Group and Robert Cassera as the persons or entities for whose benefit each of the Two-Year Transfers was made.

137.    Pursuant to sections 550(a) and (f) of the Bankruptcy Code, within one year after the Court enters judgment avoiding any Two-Year Transfer to a Defendant that was the initial

transferee as described in this Complaint, the Trustee may bring an action to avoid any subsequent transfer of a Two-Year Transfer to any immediate or mediate transferee, including but limited to any of the Defendants named herein. The Trustee expressly reserves the right to bring such additional actions.

WHEREFORE, Plaintiff, as chapter 11 trustee of TSE, respectfully requests that the Court enter an Order (a) avoiding each of the Two-Year Transfers pursuant to section 548(a)(1)(A) of the Bankruptcy Code; (b) entering judgment against each Tri-State Group entity and Robert pursuant to section 550(a) of the Bankruptcy Code in the amount of the Two-Year Transfers; (c) awarding Plaintiff pre- and post-judgment interest, costs, and attorneys' fees and expenses; and (d) granting such other equitable relief as may be just and proper.

## COUNT VI

### Avoidance and Recovery of Transfers Pursuant to N.Y. DCL §§ 273, 278 and 279, and §§ 544(b)(1) and 550(a) of the Bankruptcy Code (Tri-State Group and Robert Cassera)

138. Plaintiff restates and re-alleges paragraphs 1 through 97 of this Complaint as though fully set forth herein.

139. The Tri-State Transfers constituted transfers of interests in TSE's property.

140. The Tri-State Transfers were made, mediately or immediately, to Defendants who received the Tri-State Transfers as described in this Complaint.

141. Robert Cassera benefitted from each of the Tri-State Transfers because he was able to use the commingled proceeds of the Tri-State Transfers for his own purposes, including to fund other businesses owned or controlled by him.

142. Each entity within the Tri-State Group benefitted from each of the Tri-State Transfers because it was able to use the commingled proceeds of the Tri-State Transfers to fund its own business operations.

143.    The Tri-State Transfers were made by TSE without a fair consideration.

144.    TSE was insolvent on the dates that each Tri-State Transfer was made, or was rendered insolvent as a result of each of the Tri-State Transfers.

145.    At the time each of the Tri-State Transfers was made, TSE was engaged in business or transaction, or was about to engage in business or transaction, for which TSE's remaining property was an unreasonably small capital.

146.    At the time each of the Tri-State Transfers was made, TSE intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

147.    Actual creditors, including the Internal Revenue Service, exist who could avoid the Tri-State Transfers, and obtain further relief, pursuant to section 278 and/or 279 of the New York Debtor and Creditor Law ("N.Y. DCL").

148.    Such creditors could obtain a judgment for the value of the Tri-State Transfers received as described in this Complaint against the first transferee of the asset or against the persons for whose benefit the Tri-State Transfers were made.

149.    The Trustee may avoid the Tri-State Transfers pursuant to section 544(b)(1) of the Bankruptcy Code and may recover, for the benefit of the TSE estate, the Tri-State Transfers or their value from the Defendant that received the Tri-State Transfers as described in this Complaint, and from each member of the Tri-State Group and Robert Cassera as the persons or entities for whose benefit each of the Tri-State Transfers was made.

150.    Pursuant to sections 550(a) and (f) of the Bankruptcy Code, within one year after the Court enters judgment avoiding any Tri-State Transfer to a Defendant that was the initial transferee as described in this Complaint, the Trustee may bring an action to avoid any subsequent transfer of a Tri-State Transfer to any immediate or mediate transferee, including but

limited to any of the Defendants named herein. The Trustee expressly reserves the right to bring such additional actions.

WHEREFORE, Plaintiff, as chapter 11 trustee of TSE, respectfully requests that the Court enter an Order (a) avoiding each of the Tri-State Transfers pursuant to N.Y. DCL § 278 and/or 279 and section 544(b)(1) of the Bankruptcy Code; (b) entering judgment against each Tri-State Group entity and Robert Cassera pursuant to section 550(a) of the Bankruptcy Code in the amount of the Tri-State Transfers; (c) awarding Plaintiff pre- and post-judgment interest, costs, and attorneys' fees and expenses; and (d) granting such other equitable relief as may be just and proper.

## COUNT VII

### Avoidance and Recovery of Transfers Pursuant to N.Y. DCL §§ 276, 278 and 279, and §§ 544(b)(1) and 550(a) of the Bankruptcy Code (Tri-State Group and Robert Cassera)

151. Plaintiff restates and re-alleges paragraphs 1 through 97 of this Complaint as though fully set forth herein.

152. The Tri-State Transfers constituted transfers of interests in TSE's property.

153. The Tri-State Transfers were made, mediately or immediately, to Defendants who received the Tri-State Transfers as described in this Complaint.

154. Robert Cassera benefitted from each of the Tri-State Transfers because he was able to use the commingled proceeds of the Tri-State Transfers for his own purposes, including to fund other businesses owned or controlled by him.

155. Each entity within the Tri-State Group benefitted from each of the Tri-State Transfers because it was able to use the commingled proceeds of the Tri-State Transfers to fund its own business operations.

156.    Robert Cassera benefitted from each of the Tri-State Transfers because he was able to use the commingled proceeds of the Tri-State Transfers to fund other businesses owned by him, and to fund Tri-State's obligations.

157.    The Tri-State Transfers were made with the actual intent to hinder or delay present or future creditors of TSE within the meaning of section 276 of the New York Debtor and Creditor Law ("N.Y. DCL").

158.    Actual creditors, including the Internal Revenue Service, exist who could avoid the Tri-State Transfers, and obtain further relief, pursuant to N.Y. DCL § 278 and/or 279.

159.    Such creditors could obtain a judgment for the value of the Tri-State Transfers received as described in this Complaint against the first transferee of the asset or against the persons for whose benefit the Tri-State Transfers were made.

160.    The Trustee may avoid the Tri-State Transfers pursuant to section 544(b)(1) of the Bankruptcy Code and may recover, for the benefit of the TSE estate, the Tri-State Transfers or their value from the Defendant that received the Tri-State Transfers as described in this Complaint, and from each member of the Tri-State Group and Robert Cassera as the persons or entities for whose benefit each of the Tri-State Transfers was made.

161.    Pursuant to sections 550(a) and (f) of the Bankruptcy Code, within one year after the Court enters judgment avoiding any Tri-State Transfer to a Defendant that was the initial transferee as described in this Complaint, the Trustee may bring an action to avoid any subsequent transfer of a Tri-State Transfer to any immediate or mediate transferee, including but limited to any of the Defendants named herein.  The Trustee expressly reserves the right to bring such additional actions.

WHEREFORE, Plaintiff, as chapter 11 trustee of TSE, respectfully requests that the Court enter an Order (a) avoiding each of the Tri-State Transfers pursuant to N.Y. DCL § 278 and/or 279 and section 544(b)(1) of the Bankruptcy Code; (b) entering judgment against each Tri-State Group entity and Robert Cassera pursuant to section 550(a) of the Bankruptcy Code in the amount of the Tri-State Transfers; (c) awarding Plaintiff pre- and post-judgment interest, costs, and attorneys' fees and expenses; and (d) granting such other equitable relief as may be just and proper.

## COUNT VIII

### Avoidance and Recovery of Preferential Transfers to Insiders Pursuant to §§ 547(b) and 550(a) of the Bankruptcy Code
### (Tri-State Group and Robert Cassera)

162.    Plaintiff restates and re-alleges paragraphs 1 through 97 of this Complaint as though fully set forth herein.

163.    The One Year Transfers were made, mediately or immediately, to Defendants who received the One Year Transfers as described in this Complaint.

164.    The One-Year Transfers were made on account of antecedent debt owed by TSE before the One-Year Transfers were made.

165.    The One-Year Transfers were made while TSE was insolvent.

166.    At the time of the One-Year Transfers, each Defendant to whom, or for whose benefit, the One-Year Transfers were made was an "insider" of TSE within the meaning of section 101(31) of the Bankruptcy Code.

167.    The One-Year Transfers were made within one year before TSE's Petition Date.

168.    The One-Year Transfers enabled each Defendant to receive more than each Defendant would receive if this case was a case under chapter 7 of the Bankruptcy Code, the

One-Year Transfers had not been made, and each Defendant received payment in such chapter 7 case to the extent provided by the Bankruptcy Code.

169.     The Trustee may avoid the One-Year Transfers pursuant to section 547(b) of the Bankruptcy Code.

170.     Robert Cassera benefitted from each of the One-Year Transfers because he was able to use the commingled proceeds of the One-Year Transfers for his own purposes, including to fund other businesses owned or controlled by him.

171.     Each entity within the Tri-State Group benefitted from each of the One-Year Transfers because it was able to use the commingled proceeds of the One-Year Transfers to fund its own business operations.

172.     The Trustee may recover, for the benefit of the TSE estate, the One-Year Transfers or their value from each Defendant who received the One-Year Transfers as described in this Complaint, and from each member of the Tri-State Group and Robert Cassera as the persons or entities for whose benefit each of the One-Year Transfers was made.

173.     Pursuant to sections 550(a) and (f) of the Bankruptcy Code, within one year after the Court enters judgment avoiding any One-Year Transfer to a Defendant that was the initial transferee as described in this Complaint, the Trustee may bring an action to avoid any subsequent transfer of a One-Year Transfer to any immediate or mediate transferee, including but limited to any of the Defendants named herein.  The Trustee expressly reserves the right to bring such additional actions.

WHEREFORE, Plaintiff, as chapter 11 trustee of TSE, respectfully requests that the Court enter an Order (a) avoiding each of the One-Year Transfers pursuant to section 547(b) of the Bankruptcy Code; (b) entering judgment against each Tri-State Group entity and Robert

Cassera pursuant to section 550(a) of the Bankruptcy Code in the amount of the One-Year Transfers; (c) awarding the Trustee pre- and post-judgment interest, costs, and attorneys' fees and expenses; and (d) granting such other equitable relief as may be just and proper.

## COUNT IX

**Unlawful Distribution to Shareholders**
**(Robert Cassera, Messina, Joseph Cassera and Foley)**

174.    Plaintiff restates and re-alleges paragraphs 1 through 97 of this Complaint as though fully set forth herein.

175.    The Tri-State Transfers were disguised distributions to TSE shareholders, as that term is used in Fla. Stat. Ann. § 607.06401.

176.    Robert Cassera, Messina, Joseph Cassera and Foley authorized and directed each of the Tri-State Transfers.

177.    After giving effect to each of the Tri-State Transfers, TSE was not able to pay its debts as they became due in the usual course of business.

178.    Pursuant to Fla. Stat. Ann § 607.0834(1), each of Robert Cassera, Messina, Joseph Cassera and Foley was a distributor or acted as a *de facto* director of TSE, and each is liable for the Tri-State Transfers, which were improper.

WHEREFORE, Plaintiff, as chapter 11 trustee of TSE, respectfully requests that the Court enter judgment in favor of Plaintiff and against Robert Cassera, Messina, Joseph Cassera and Foley, jointly and severally, in the amount of all Tri-State Transfers shown at trial to be disguised distributions to shareholders (plus interest, costs and attorneys' fees), and grant such other equitable relief as may be just and appropriate.

## COUNT X

### Unjust Enrichment
### (Robert Cassera and Tri-State Group)

179.    Plaintiff restates and re-alleges paragraphs 1 through 97 of this Complaint as though fully set forth herein.

180.    By making the Tri-State Transfers, Robert Cassera and the Tri-State Group were enriched in an amount exceeding $100 million as Robert Cassera and the Tri-State Group received and retained the Tri-State Transfers, or benefitted therefrom.

181.    The Tri-State Transfers enriched Robert Cassera and the Tri-State Group at the expense of TSE and its creditors.

182.    It would be against equity and good conscience to permit Robert Cassera and the Tri-State Group to retain the Tri-State Transfers or the benefit thereof, which assets or benefit they obtained only by virtue of their own misconduct and fiduciary breaches, as described above.

WHEREFORE, Plaintiff, as chapter 11 trustee of TSE, respectfully requests that the Court enter judgment in favor of Plaintiff and against Robert Cassera and the Tri-State Group, jointly and severally, in an amount to be proven at trial, plus interest, costs and attorneys' fees, and such other equitable relief as may be just and proper.

## COUNT XI

### Disallowance of Claims
### (All Defendants)

183.    Plaintiff restates and re-alleges and restates paragraphs 1 through 97 of this Complaint as though fully set forth herein.

184.    Pursuant to § 502(d) of the Bankruptcy Code, any claim of any entity from which property is recoverable under sections 542, 543, 550 or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 552(f), 522(h), 544, 545, 547, 548, 549, or

724(a) of the Bankruptcy Code shall be disallowed, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of the Bankruptcy Code.

185.    The Defendants have not paid to the Trustee the amounts for which they are liable under sections 522(i), 542, 543, 550, or 553 of the Bankruptcy Code.

WHEREFORE, Plaintiff, as chapter 11 trustee for TSE and the CRS Debtors, respectfully requests pursuant to 11 U.S.C. § 502(d) that the Court disallow any claims of any Defendant against the Debtors pursuant to § 502(d) of the Bankruptcy Code, and grant such further and other relief as the Court may deem equitable and just.

## COUNT XII

**Preliminary Injunction Freezing Assets Pursuant to Fed. R. Civ. P. 64 and Fed. R. Bankr.**
**P. 7064; Fed. R. Civ. P. 65 and Fed. R. Bankr. P. 7065;**
**N.Y. DCL § 279(a); and § 105 of the Bankruptcy Code**
**(Tri-State Group and Robert Cassera)**

186.    Plaintiff restates and realleges paragraphs 1 through 97 of this Complaint as though fully set forth herein.

187.    Plaintiff seeks preliminary injunctive relief prohibiting and preventing the Tri-State Group entities and Robert Cassera from making further transfers, dissipating, or otherwise disposing of (i) any of the Tri-State Transfers or the proceeds, profits or gains thereon; and (ii) any other transferred assets, ill-gotten gains, or other property or proceeds sought to be recovered in Counts I through X above.

188.    The preliminary injunction sought by Plaintiff against the Tri-State Group entities and Robert Cassera to prevent the dissipation or further transfer of the property sought to be recovered by this Complaint is appropriate as New York law allows this Court to issue a preliminary injunction restraining any Defendant that received fraudulent transfers (either as an

initial or subsequent transferee) from the Debtors. N.Y. DCL § 279(a). Moreover, Plaintiff's requested injunction also is appropriate under New York law (McKinney's Consolidated Laws of New York § 6301), which is made applicable to this proceeding by Federal Rule of Civil Procedure 64 and 65, and, in turn, by Rule 7064 and Rule 7065 of the Federal Rule of Bankruptcy Procedure, and pursuant to this Court's general equitable jurisdiction, *see* Judiciary Act of 1789, § 11, 1 Stat. 73, and independently pursuant to § 105(a) of the Bankruptcy Code.

189. Without issuance of an injunction, Plaintiff will suffer irreparable harm as there is a high probability that Plaintiff would be unable to recover the assets sought for the benefit of the Debtors' estates and their creditors. There is a high risk of dissipation or further transfer of the assets Plaintiff seeks to recover in the absence of an injunction preserving the status quo *pendente lite* given the past conduct of the Tri-State Group entities and Robert Cassera, as described above, which includes a pattern of causing the Debtors to make fraudulent transfers to those Defendants as well as, in the case of Robert Cassera, unlawful distributions for his benefit and to the detriment of the Debtors' creditors, and engaging in significant inequitable conduct, including numerous violations of his fiduciary duties with no regard for the Debtors' welfare. Put simply, the Tri-State Group and Robert Cassera's prior behavior is the strongest indicator that absent an injunction, those Defendants will seek to dissipate the funds the Trustee now seeks to recover and continue to inequitably harm the Debtors' estates.

190. Plaintiff is likely to succeed on the merits of this Complaint. At a minimum, the allegations in this Complaint raise sufficiently serious questions going to the merits to supply a fair ground for litigation.

191. Further, the balance of hardships favors Plaintiff, who without a preliminary injunction very well may be unable to recover the transferred assets for the benefit of the estates

and creditors, over the Tri-State Group and Robert Cassera, who would need only to maintain the *status quo* to comply with the requested injunctive relief.

192.    In sum, the dissipation or further transfer of the property sought to be recovered by this Complaint would diminish the recovery for the estates and creditors and impede the progress of the above-captioned bankruptcy cases.  Consequently, an injunction is necessary to preserve and protect the Debtors' estates.

193.    Moreover, as described above, the balance of hardships tips in favor of Plaintiff over the applicable Defendants.  The public interest similarly weighs in favor of Plaintiff as an essential responsibility of a bankruptcy trustee, such as Plaintiff, is to collect and liquidate the assets of a debtor's estate, including causes of action.  The requested injunction will help ensure Plaintiff is able to accomplish that goal.  On the other hand, no public interest is served by allowing the Tri-State Group and Robert Cassera to dissipate assets that rightfully belong to the Debtors' estates.

WHEREFORE, Plaintiff, as chapter 11 trustee for TSE and the CRS Debtors, respectfully requests that this Court enter an injunction freezing the assets of the Tri-State Group entities and Robert Cassera, and grant such other or further equitable relief as may be just and proper.

Respectfully submitted,

By: _/s/ Richard Levin_____

Richard Levin
Brian J. Fischer
Rémi J.D. Jaffré
JENNER & BLOCK LLP
919 Third Avenue, 38th Floor
New York, New York 10022
Tel. (212) 891-1600; fax (212) 909-0815

Vincent E. Lazar
JENNER & BLOCK LLP
353 North Clark Street
Chicago, Illinois 60654
Tel. (312) 222-9350; fax (312) 527-0484

*Attorneys for Plaintiff*

Dated: New York, New York
      January 31, 2017